UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ROBERT MASON,

                Plaintiff,

                                            Case No. 11-11390

v.                                         Honorable Thomas L. Ludington

ARCTIC CAT, INC.,

                Defendant.

_____ /

**OPINION AND ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This dispute arises out of the termination of Plaintiff Robert Mason's employment relationship with Defendant Arctic Cat.  About a month before Plaintiff turned forty, Defendant terminated the relationship.  Defendant asserts that it did so because Plaintiff repeatedly used a company credit card for personal expenses while reporting them as business expenses.  Plaintiff disagrees, and so brought suit in state court alleging that: (1) Defendant terminated Plaintiff's employment because of his age, violating Michigan's Elliot-Larsen Civil Rights Act, Mich. Comp. Laws §§ 37.2101–.2804; and (2) Defendant breached its agreement to pay Plaintiff's commissions for sales completed before his employment was terminated, entitling him to treble damages, attorney fees, and court costs pursuant to Mich. Comp. Laws § 600.2961.  Based on diversity of citizenship, Defendant removed the case to this Court.

Defendant now moves for summary judgment.  ECF No. 8.  First, Defendant asserts that it is entitled to judgment on the age discrimination claim because Plaintiff does not establish that he is a member of a protected class or that Defendant's proffered reason for ending the employment relationship was mere pretext for intentional discrimination.  Next, Defendant

asserts that it is entitled to judgment on the breach of the contract claim because, pursuant to a restrictive covenant Defendant promulgated, Plaintiff forfeited his right to the commissions by working for a competitor.

Defendant is entitled to judgment on the age discrimination claim. Plaintiff offers no evidence that Defendant's proffered reason for ending the employment relationship was pretextual. In contrast, genuine issues of fact exist as to whether Defendant's proffered restrictive covenant formed part of Plaintiff's employment contract. Neither of the two versions that Defendant proffers were unequivocally approved by Defendant itself — the "approved by" line is blank. Moreover, Defendant offers no direct evidence that it provided Plaintiff notice of the policy. And Plaintiff denies that he was notified of the policy. Additionally, even if the restrictive covenant formed part of Plaintiff's employment contract, an issue of fact exists as to whether the company that Plaintiff went to work for is a competitor of Defendant.

Accordingly, Defendant's motion will be granted in part and denied in part.

# I

## A

Under the brand name "Arctic Cat," Defendant produces and markets snowmobiles and all-terrain vehicles, as well as related parts, garments, and accessories. Based in Thief River Falls, Minnesota, Defendant sells its products to a network of independent dealers in the United States and Canada, as well as to international distributors.

Plaintiff, a Michigan resident, was a part of Defendant's sales force for twenty years. Plaintiff began working for Defendant as a sales representative in 1988. He was nineteen. Ten years later, Defendant transformed its sales force of independent contractors to employees, who

were given the title of "district sales managers."   Plaintiff's territory included twenty-six independent Arctic Cat dealerships in Michigan.

Formerly, sales representatives had reported to the national sales manager.   As employees, district sales managers reported to new "regional sales managers."   They also received employee handbooks, signing acknowledgements that provided "I understand and agree that my employment with Arctic Cat Inc. is 'at will,' meaning that it is not for any definite period of time and that either I or Arctic Cat Inc. may terminate our employment relationship at any time for any legal reason."  Def.'s Mot. for Summ. J. Ex. 4, ECF No. 8 ("Def.'s Mot.").  Plaintiff signed this acknowledgement in 1998.  Def.'s Mot. Ex. 4.

Sometime later (the record is unclear on precisely when[1]), Defendant gave Plaintiff a company credit card issued by Wells Fargo Bank.   Plaintiff signed a "Cardholder User Agreement" that provided in pertinent part:

- I agree to use the Card, whenever possible, for all business related travel, meals and entertainment, hotels and car rentals, and any other business related charges.

- I will reconcile my expenses on a monthly basis using the on-line system at the end of each monthly cycle, resolve any discrepancies, and submit the receipts to Accounts Payable promptly.

- I understand that under no circumstances will I use the Card to make personal purchases, either for myself or for others.  Using the card for personal charges could result in corrective action, up to and including termination of employment.

Def.'s Mot. Ex. 10.  Defendant also announced a "corporate expense" policy that provided in pertinent part:

---

[1] As an exhibit, Defendant attaches a cardholder user agreement dated June 2007 and endorsed by Plaintiff. Def.'s Mot. Ex. 10.  Other exhibits, however, establish that Plaintiff had a company credit card at least as early as September 2006.  *See, e.g.*, *id.* Ex. 14.

- Expenses are reported through the Wells Fargo CCER System.  At the beginning of each month an email will be sent to you from Wells Fargo telling you that your statement is ready for review.  You will have 7 days to add descriptions, out of pocket expenses and complete the review.  Print a copy of the statement and tape the receipts to paper then send to Bonnie [Olson] in Accounting within one week of the completion of your review. . . .

- Absolutely NO PERSONAL charges can be put on your Corporate card.  RSM [the regional sales manager] will be notified if personal charges appear on statement and a letter of warning sent to DSM [the district sales manager] and put in the employee file.

Def.'s Mot. Ex. 12, at 3–4.

In 2006, Plaintiff fell behind in submitting his monthly expense report reviews.  On October 8, 2006, Ms. Olson emailed him about the issue.  *See* Def.'s Mot. Ex. 13.  Following up four days later, she wrote:

On 9/8/06 I emailed you reminding you that the last report I have from you is June 24 and asked that you get your expenses current.  As of this date I have not received any reports.  At this time you have over $7000 in outstanding credit card charges . . . .  As in the past, if your reports are not current and received at my desk by October 27, your card will be put on hold . . . .  If this pattern continues you will loose [sic] the privilege of having a corporate card.

*Id*.  Although Plaintiff appears to have then brought his reports current, a short time later he again fell behind.  In February 2007, Ms. Olson wrote to Plaintiff and his supervisor, Michael Killian:

FYI – I have not received [Plaintiff's] expenses from 9/9[06] thru current, and have not received any correspondence from [Plaintiff] regarding the status of his reports.  I will be shutting off the card at noon tomorrow (Friday, February 23) if the reports are not on my desk by that time.  I have given him sufficient warnings.

Def.'s Mot. Ex. 14.

In October 2007, Ms. Olson again took issue with Plaintiff's expense report reviews, this time because he was not including credit card receipts for his purchases.  When Ms. Olson

requested the receipts directly from the merchants, she found "questionable charges." Olson Aff. ¶ 10, *attached as* Def.'s Mot. Ex. 11. Documenting inconsistencies between Plaintiff's charges and his reports, she later created a spreadsheet of the questionable transactions. See Def.'s Mot. Ex. 22.

In October 2007, for example, Plaintiff used his company credit card to purchase $113 in goods from the Tractor Supply Company. The purchase included $54 in shoes for his son and daughter. Plaintiff recorded it simply as a business expense for "bales for halloween ride w club." Def.'s Mot. Ex. 18; *see also* Pl.'s Dep. 99:6–25, June 20, 2011 ("Clearly the description on the receipt does not add up to what I described. I don't have an answer for that."), *attached as* Def.'s Mot. Ex. 3.

In November 2007, Plaintiff used the company card to purchase $425 goods from New Century Signs, including decals for his son's snowmobile, again recording the charge simply as a business expense (as "signage for open house and Christmas mini promo"). Def.'s Mot. Ex. 20; *see also* Pl.'s Dep. 102:6–104:12 ("I remember this one specifically. This one had — there was one dollar amount charged, and I did a banner for a local dealership and there was a mini promotion that we were out at the time selling. They listed it as one item. And it also had decals for a snowmobile on it as well. And I remember this specifically, and for some reason the only receipt they had was for the decals.").

The following month, Plaintiff used the company card to make a $210 purchase from St. Helen Power Sports. The purchase included $125 in snowmobile trail permits, $85 in boots for his son and daughter. He recorded it simply as a business expense for "trail permits for demos." Def.'s Mot. Ex. 21; *see also* Pl.'s Dep. 100:20–101:25 ("Q: That was something that you

purchased for your children? A: Correct. Yup.  And at the time I turned this in I didn't have that itemized receipt and it was 30 days later and that's 100 percent my fault.").

In the fall of 2007, Mr. Killian left Defendant's employment.  Derek Jordahl became Plaintiff's new supervisor.  Unlike Mr. Killian, who had been a district sales manager before being promoted to regional sales manager, Mr. Jordahl was new to the company when he was hired as regional sales manager.

In early 2008, Mr. Jordahl accompanied Plaintiff on a series of customer visits.  The trip did not go well.  *See* Pl.'s Dep. 54:24–25, 55:8–9 ("He was new to the company, and in the travels and visits to the customers he was offending them. . . . [H]e spoke out of turn often.").  The ride home did not go well either.  Driving back, Plaintiff recalls, Mr. Jordahl remarked "you've been around a long time and maybe you should move on."  Pl.'s Dep. 53:6–7.  A few months later, Plaintiff would be forced to do just that.  In the interval, Defendant alleges, it promulgated its restrictive covenant.

**B**

In February 2008, Defendant asserts, it issued a "Commission Payment Policy" establishing whether employees would be entitled to post-termination commissions.  *See* Def.'s Mot. Ex. 9; Def.'s Reply Ex. 30 (attaching two versions of the policy).  Establishing a restrictive covenant, the policy provides in pertinent part:

> DSMs [district sales managers] terminating employment with Arctic Cat will receive commissions on product ordered but not delivered or accepted as of their last day of active employment, subject to and following delivery, dealer acceptance and the audit and approval process, if they meet the following requirements:
>
> 1.  They are not employed by or in any other way performing services for an Arctic Cat competitor. . . .

-6-

Approved by: _____

Def.'s Mot. Ex. 9, at 2; Def.'s Reply Ex. 30, at 1.

Defendant's manager of compensation and benefits, Randy Twistol, testifies that the policy "was distributed to all DSMs personally at the Snowmobile Sales Show in Nashville, Tennessee on or about February 22, 2008." Twistol Aff. ¶ 6, *attached as* Def.'s Reply Ex. 29, ECF No. 11.

It is not obvious, however, whether Plaintiff personally received the policy. For example, Mr. Twistol does not expressly assert that Plaintiff was present at the Nashville snowmobile sales show. *See id.* ¶¶ 6–7. And Mr. Twistol's use of the passive voice (testifying that the "policy was distributed") avoids the question of who gave the policy to Plaintiff, if anyone. Unlike the signed acknowledgements that Defendant required for receipt of the employee handbooks, Defendant did not ask for signed acknowledgements for the receipt of the policy. In sum, Defendant offers no direct evidence that Plaintiff received the policy.

Plaintiff, in contrast, unequivocally testifies that he did not receive it, asserting: "The policy and procedure which is Exhibit 9 to Defendant's Motion, I only saw for the first time when I received it along with a letter dated January 13, 2009 from Randy Twistol explaining why the company was not going to pay my post-termination commissions and bonuses." Pl.'s Aff. ¶ 11, *attached as* Pl.'s Resp. to Def.'s Mot. Ex. 7, ECF No. 10 ("Pl.'s Resp."). In his deposition, Defendant's counsel asked Plaintiff:

> Q: [The document] says "DSMs terminating employment with Arctic Cat will receive commissions on product ordered but not delivered or accepted as of their last day of active employment, subject to and following delivery, dealer acceptance and the audit and approval process, if they meet the following requirements," right?
> A: Yup.

-7-

> Q: And the first one says "They are not employed by or in any other way performing services for an Arctic Cat competitor," right?
> A: Uh-huh. . . .
> Q: And that was the policy and procedure that you understood to be in place during the time period that you were working at Arctic Cat, right?
> A: No.
> Q: Is there a different policy and procedure that we haven't looked at yet in this deposition?
> A: I'm not aware of this policy and procedure at all. It was never presented to me in any way, shape or form that I recall.
> Q: You're not saying that you didn't receive it at some point, you just don't have a recollection of receiving it? Fair to say?
> A: I don't have a recollection of receiving it, no.
> Q: Do you have a recollection of receiving some other policy and procedure in written form?
> A: No.

Pl.'s Dep. 121:24–122:9, 122:20–123:10. Plaintiff, in turn, offers the deposition of his former manager, Mr. Killian, who was asked:

> Q: Were you aware of any noncompetition clauses that district sales managers were required to sign?
> A: No. I had a sales manager who went to work for Bombardier, Ski-Doo, BRP as it's known, Mike Webster, who had Maine and New Hampshire as his territory. He went to work for a direct competitor.
> Q: Did he receive any adverse —
> A: No.
> Q: — action on behalf of Arctic Cat Corporation?
> A: No. He was paid in full.

Killian Dep. 32:10–19, Sept. 9, 2011, *attached as* Pl.'s Resp. Ex 1. Of course, Mr. Killian had left Defendant's employment in the fall of 2007, before the policy was purportedly announced.

Plaintiff also makes two observations about Exhibit 9 itself. First, Plaintiff notes, it has "a line wherein the document is to be approved, and it is blank. [Additionally], there is a revision date of December 1, 2008, which is substantially after [Plaintiff] left the employ of Arctic Cat." Pl.'s Resp. 5 (emphasis omitted); *see* Def.'s Mot. Ex. 9, at 2 (attaching policy with "Revision Date: December 11, 2008").

-8-

Defendant does not address Plaintiff's first observation (regarding the blank "approved by" line). Defendant does, however, reply to Plaintiff's "revision date" observation, producing a document dated February 1, 2008, several months before Plaintiff was forced to resign. Def.'s Reply Ex. 30. This document contains an identical restrictive covenant as that quoted above. It also contains a blank "Approved by" line. *Id.*

<div align="center">C</div>

In April 2008, Defendant's human resources manager, Leigh Kennedy, met with Plaintiff. Mr. Kennedy testifies that at the meeting,

> [Plaintiff] was questioned about his use of the corporate credit card for personal expenses and the lack of receipts supporting his expense reconciliations. [Plaintiff] was given an opportunity to try and explain the questionable transactions. [Plaintiff] did not provide an acceptable business justification for the purchases in question.

Kennedy Aff. ¶¶ 9–10, *attached as* Def.'s Mot. Ex. 2.

The next month, Defendant's general manager, Mary Ellen Walker, and Plaintiff's supervisor, Mr. Jordahl, met with Plaintiff and offered him an opportunity to resign. After being informed that if he did not resign he would be terminated, Plaintiff resigned. When he inquired about the reason he was being forced to resign, Defendant informed him that it "had decided to go 'in a different direction.'" Pl.'s Aff. ¶ 9. Mr. Kennedy testifies that "[t]he reason for ending [Plaintiff's] employment with Arctic Cat was his misuse of the corporate credit card and his falsification of expense reports." Kennedy Aff. ¶ 11.

In September 2008, Plaintiff entered into a "sales representative agreement" with Teton Outfitters, LLC, d/b/a Klim USA, to act as a sales consultant. (Plaintiff's former supervisor, Mr.

Killian, was also hired by Klim after leaving Defendant, becoming Klim's vice-president of sales.)  Klim produces apparel designed for motorcycle and snowmobile riders.

On January 12, 2009, Plaintiff emailed Defendant's manager of compensation and benefits, Mr. Twistol, regarding unpaid commissions.  By letter dated the following day, Mr. Twistol responded:

> I've enclosed a copy of Arctic Cat's policy regarding payment of commissions following termination and please take note to the highlighted area on page two. Due to your position as an independent representative and selling the products of an Arctic Cat competitor, we feel our obligations for all commissions have been fulfilled.

Def.'s Mot. Ex. 27.  As noted, Plaintiff asserts that this letter was the first time he was notified of Defendant's policy.  *See* Pl.'s Aff. ¶ 11 (quoted above).  Replying to Plaintiff's contention, Defendant produces an undated letter from Plaintiff to Mr. Twistol in which Plaintiff writes:

> Since my employment is going to end anyway, and I am going to offer my forced resignation, however I am not giving up my right to the agreed upon commissions that are owed and earned.  I have enclosed a copy of those with this.  I am asking you wave [sic] going to competitors as a complication of this.

Def.'s Reply Ex. 31.

Defendant, maintaining its position that it has no obligation to pay Plaintiff's post-termination commissions because of the restrictive covenant, has not paid the commissions. Plaintiff takes issue with this for several reasons.  As discussed above, he disputes whether Defendant itself adopted the policy and whether he received notice of it.  Additionally, he disputes whether Klim is a competitor.  In his deposition, for example, Defendant's counsel asked Plaintiff:

> Q: And I think you have acknowledged before that Klim is a competitor of Arctic Cat, correct?
> A: In fact, it's been proven that they're not a competitor.  But —
> Q: What do you mean it's been proven they're not a competitor?

> A: There was some court — they don't make all the same products that Arctic
> Cat does.
> Q: They have a broader line of products, fair to say, than the Arctic Cat product
> line in terms of ride gear?
> A: I would have to say a much narrower line of products, truthfully.
> Q: What is that — can you describe for me that — what Klim's products are?
> A: They sell extremely high end technical riding gear . . . .
> Q: Do you know generally what the lawsuit was about?
> A: Dealer base and available to market.
> Q: Dealer base and available — I'm not following you.  What does that mean?
> A: Whether or not you could sell to the existing dealer base or not.  Because
> when I did consulting work for Klim I had a listing of dealers that they were
> the only dealers I could solicit the product to.
> Q: Because of some agreement that existed between Arctic Cat and Klim or an
> agreement between you and Arctic Cat?
> A: Nope, it was not between me and Arctic Cat.  That was what Klim described
> to me.
> Q: Okay.  So there's some sort of agreement between Klim and Arctic Cat
> regarding what could be sold at Arctic Cat dealer?
> A: Correct.  And as a result of that I didn't nor — solicit outside of that dealer
> listing.

Pl.'s Dep. 76:2–14, 77:25–78:16; *see also* Pl.'s Aff. ¶ 12 ("I do not believe that Klim is a direct

competitor of Arctic Cat for the reason that Arctic Cat's clothing and accessory lines do not

directly compete.  Klim's products contain Gortex and none of Arctic Cat's do.  At no time did I

offer or was I involved in the sale of any Klim products to Arctic Cat dealers that I had

represented.").

To support his assertions, Plaintiff also offers the deposition of Mr. Killian, who was

asked, for example:

> Q: Was there ever a finding by any court regarding whether or not Klim, the
> corporation you went to work for, was in fact a competitor of Arctic Cat?
> A: I can tell you what the judge said in [my] case. . . .  The judge said that when
> the facts were presented that she was inclined to rule for Arctic Cat; however,
> she would hear the arguments anyway and after the arguments were heard the
> judge said she was inclined to rule for me at which time I immediately
> received an agreement from Arctic Cat.[2]

---

[2] During the deposition, Defendant's counsel made a hearsay objection to the trial judge's statements.  *See*
*Meirthew v. Amore*, 417 Fed. App'x 494, 496 n.2 (6th Cir. 2011) (noting that in summary judgment motions, a party

-11-

Q: And that resolved the lawsuit?
A: Yes.
Q: What is Klim?
A: Klim is a manufacturer of high performance motor sports sportswear for both
   warm and cold weather riding.
Q: Does Arctic Cat provide the same kind of sportswear?
A: Arctic Cat provides riding gear; however, the nature of Klim's is much more
   technical.  Klim has an exclusive Gortex agreement, Gortex being
   predominant in semi-permanent membranes, weatherproof membranes.  Klim
   is a very expensive product.  It's a different product.
Q: Did Arctic Cat provide or manufacture or sell a similar product?
A: No.  Not one that had Gortex material in it.
Q: Was it your belief at the time that you went to work for Klim that you were
   not going to work for a competitor?
A: Absolutely.

Killian Dep. 31:2–32:9.

Defendant responds to Plaintiff's argument with an affidavit from its general manager,

Ms. Walker, who testifies: "Arctic Cat considers Klim to be a competitor for the sale of

snowmobile garments."  Walker Aff. ¶ 6, *attached as* Def.'s Mot. Ex. 1.  Defendant offers no

other evidence to establish that Arctic Cat and Klim are competitors.

**D**

In February 2011, Plaintiff filed suit in the Circuit Court of Otsego, Michigan.  Count one

of the two-count complaint alleges age discrimination in violation of the Elliot-Larsen Civil

Rights Act.  Count two alleges breach of contract for Defendant's refusal to compensate Plaintiff

for sales completed before he was forced to resign.  Defendant removed the case to this Court

and now moves for summary judgment.

---

"may offer any relevant and admissible evidence" (citing Fed.R.Civ.P. 56(c)(2))).  Defendant's objection, however, is not well-placed for at least two reasons.  First, the judge's statement falls within the exception for statements of "the declarant's then existing state of mind . . . (such as intent . . .)."  Fed. R. Evid. 803(3).  That is, the judge's statement regards what she was inclined to do — what she thought she would do — and so falls within the hearsay exception governing future intent.  *See, e.g.*, *United States v. Dorman*, 108 F. App'x 228, 243 (6th Cir. 2004).  And second, the judge's statement is not being offered for the truth of the matter asserted (who she was actually inclined to rule for in the pending dispute) but rather a distinct, albeit related question: whether a reasonable person could conclude that Defendant and Klim are competitors.  Introduced for this purpose, the judge's statement is not hearsay.  *See* Fed. R. Evid. 801(c).

-12-

**II**

Summary judgment should be granted if the admissible evidence shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view all facts and draw all reasonable inferences in favor of the nonmovant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

**III**

**A**

Defendant moves for judgment on Plaintiff's age discrimination claims on two grounds. First, Defendant asserts that Plaintiff is not a member of a protected class under the Elliot-Larsen Civil Rights Act (ELCRA) because he was thirty-nine years old when he was forced to resign. In the alternative, Defendant asserts, even if Plaintiff is covered by the ELCRA, he cannot establish the adverse employment action was mere pretext for discrimination. Each argument is addressed in turn.

**1**

Section 202 of the ELCRA, Mich. Comp. Laws § 37.2202, prohibits an employer from discharging an employee "because of religion, race, color, national origin, age, sex, height, weight, or marital status." Mich. Comp. Laws § 37.2202(1)(a). "Age," § 103 of the ELCRA provides, "means chronological age except as otherwise provided by law." Mich. Comp. Laws § 37.2103(a).

-13-

By its plain language, the ELCRA does not limit its operation to those forty and older. Nevertheless, Michigan courts initially interpreted its protections as limited to these persons. The courts adopted this restrictive reading based on the federal Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634 (ADEA), which by its express terms protects only "individuals who are at least 40 years of age." 29 U.S.C. 631(a) ("The prohibitions in this chapter shall be limited to individuals who are at least 40 years of age."); *see Lytle v. Malady*, 579 N.W.2d 906, 917 n.26 (Mich. 1998) (noting that under the ELCRA "protected employees [are] employees aged forty to seventy years"), *abrogated by Zanni v. Medaphis Physician Servs. Corp.*, 612 N.W.2d 845, 847 (Mich. Ct. App. 2000) (conflict panel); *see also Foster v. Tweddle Litho Co.*, No. 225169, 2002 WL 207575, at *2 n.2 (Mich. Ct. App. Feb. 8, 2002) (per curiam).

Returning to the text in *Zanni*, however, a conflict panel of the Michigan Court of Appeals[3] recognized: "Unlike the [EL]CRA, the ADEA limits the prohibitions against age discrimination 'to individuals who are at least 40 years of age.' We decline to read a similar restriction into the [EL]CRA when the Legislature apparently chose not to do so." 612 N.W.2d at 847 (internal citation omitted) (quoting 29 U.S.C. § 631(a)). Noting that the ELCRA "refers in subsection 103(1)(a) to 'chronological age,' without limiting its reach to any particular age group," the court concluded that the statute "was intended to prohibit employers from engaging in discriminatory practices against workers considered too young as well as workers considered too old." *Id.* (internal quotation marks omitted) (quoting *Zanni v. Medaphis Physician Servs. Corp.*, 612 N.W.2d 858 (Mich. Ct. App. 1999), *vacated on reh'g* 612 N.W.2d 845).

Two years after the conflict panel decision in *Zanni*, the Michigan Court of Appeals again addressed the relationship between the two statutes, explaining: "This Court follows

---

[3] *See* Mich. Ct. R. 7.215(J).

-14-

federal precedent, which defines a protected class for age discrimination in the employment context as persons between the ages of forty and seventy. However, this Court also determined that it is not necessary that the plaintiff fit within the strict federal age limits." *Foster v. Tweddle Litho Co.*, 2002 WL 207575, at *2 n.2 (internal citation omitted).

Here, Defendant is incorrect when it asserts that because Plaintiff "was only 39 when he was terminated . . . he was not a member of the protected class for age discrimination." Def.'s Br. 14. Unlike the ADEA, the ELCRA does not draw a bright line at age forty. In Michigan, thirty-nine can be "too old."

**2**

Although the substantive protections of the ELCRA are different than those of the ADEA, the manner in which a plaintiff may establish an age discrimination claim is the same. *See, e.g.*, *Meagher v. Wayne State Univ.*, 565 N.W.2d 401, 410 (Mich. Ct. App. 1997) (citing *Radtke v. Everett*, 501 N.W.2d 155 (Mich. Ct. App. 1993)).

Discrimination may be established through either direct or circumstantial evidence. Here, "Plaintiff admits that he has no 'direct evidence' of age discrimination on the part of Defendant." Pl.'s Resp. 15. Accordingly, he must establish his claim, if at all, "through circumstantial evidence, applying the familiar burden-shifting analysis set forth in *McDonnell Douglas*." *Thompson v. City of Lansing*, 410 F. App'x 922, 932 (6th Cir. 2011) (citing *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973)); see also *Meagher*, 565 N.W.2d at 410 (applying *McDonnell Douglas* framework).

The plaintiff carries the initial burden to establish the prima facie case's four elements: (1) being a member of a protected class, (2) being subject to an adverse employment action, (3)

being qualified for the position, and (4) being replaced by a younger person. *Meagher*, 565 N.W.2d at 410 (citing *Matras v. Amoco Oil Co.*, 385 N.W.2d 586 (Mich. 1986)).

If the plaintiff establishes these elements, "the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391(6th Cir. 2008) (citing *Tex. Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). "[I]f the defendant succeeds in this task, the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination." *White*, 533 F.3d at 391–92. The plaintiff may demonstrate pretext by demonstrating that the reason (1) had no basis in fact; (2) did not actually motivate the decision; or (3) was insufficient to justify the decision. *Meagher*, 565 N.W.2d at 410 (citing *Dubey v. Stroh Brewery Co.*, 462 N.W.2d 758 (Mich. Ct. App. 1990)); *see also Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 545 (6th Cir. 2008) (same)).

In this case, Plaintiff carries his initial burden of establishing a prima facie case. He is a member of the protected class under the ELCRA. He was forced to resign. He was qualified for the position. And a younger worker replaced him.

Defendant likewise carries its burden of proffering a legitimate, nondiscrimatory reason for its ending the employment relationship: Plaintiff's repeated use of the company credit card for personal expenses and his misidentification of them as business-related expenses. To begin, as noted, Plaintiff signed an agreement that provided in pertinent part: "I understand that under no circumstances will I use the Card to make personal purchases, either for myself or for others. Using the card for personal charges could result in corrective action, up to and including termination of employment." Def.'s Mot. Ex. 10. In October 2007, Plaintiff purchased shoes for

-16-

his son and daughter with the company credit card, recording it as a business expense. Def.'s Mot. Ex. 18; Pl.'s Dep. 99:6–25 (acknowledging conduct). In November 2007, Plaintiff used the company card to purchase decals for his son's snowmobile, again recording it simply as a business expense. Def.'s Mot. Ex. 20; Pl.'s Dep. 102:6–104:12 (acknowledging conduct). And the following month, Plaintiff used the company card to purchase boots for his son and daughter, again recording it a business expense. Def.'s Mot. Ex. 21; Pl.'s Dep. 100:20–101:25 (acknowledging conduct). This misuse of the company credit card establishes a legitimate, non-discriminatory reason for Defendant's action.

Plaintiff, in contrast, does not carry his burden of demonstrating that this proffered reason was mere pretext for intentional discrimination. He first asserts "that if he made minor errors in his expense records, those were due to inadvertency and never with the intent to gain an advantage from the company." Pl.'s Resp. Br. 17. This assertion, however, addresses his state of mind, not Defendant's. To show pretext, Plaintiff must address what motivated Defendant, not what motivated Plaintiff. Drawing all reasonable inferences in Plaintiff's favor, his assertion does not suggest that Defendant's proffered reason was pretextual.

Plaintiff next asserts that other employees were dilatory in filing their expense reports. *See id*. 17–18. This argument is again tangential to the issue: Defendant does not assert that it terminated Plaintiff because his expense reports were late. Rather, "The reason for ending [Plaintiff's] employment with Arctic Cat was his misuse of the corporate credit card and his falsification of expense reports." Kennedy Aff. ¶ 11. Because Plaintiff does not introduce circumstantial evidence demonstrating that this articulated reason was mere pretext for

intentional discrimination, Defendant is entitled to judgment on Plaintiff's age discrimination claim.

This conclusion is not altered by Mr. Jordhal's remark several months before Plaintiff's forced resignation that "you've been around a long time and maybe you should move on." Pl.'s Dep. 53:6–7. This single, ambiguous statement does not demonstrate that Defendant's decision had no basis in fact. Indeed, Plaintiff acknowledged the conduct at issue. It does not demonstrate that the proffered reason was insufficient to justify the decision or that the proffered reason did not actually motivate the decision. Rather, it is an ambiguous comment made by a new manager following a contentious trip with Plaintiff. *See* Pl.'s Dep. 54:24–25, 55:8–9 ("He was new to the company, and in the travels and visits to the customers he was offending them. . . . [H]e spoke out of turn often."). Defendant is entitled to summary judgment on Plaintiff's ELCRA claim.

## B

Defendant next moves for summary judgment on Plaintiff's breach of contract claim, asserting that he is not entitled to the commissions at issue because of the "Commission Payment Policy" that Defendant purportedly promulgated in February 2008. Plaintiff responds that an issue of fact exists as to whether the parties agreed to the policy. Arguing in the alternative, Plaintiff asserts that even if the parties agreed to the policy, an issue of fact exists as to whether the company that Plaintiff went to work for is a competitor of Defendant.

## 1

As a preliminary matter, the parties agree that the employment relationship was "at will." This does not mean, however, that the relationship was non-contractual. *See Morrison v. B.*

-18-

*Braun Med. Inc.*, 663 F.3d 251, 256 (6th Cir. 2011) ("Michigan's general rule regarding termination of an at-will employee is that either party may terminate the employment contract at any time for any or no reason." (citing *Suchodolski v. Mich. Consol. Gas Co.*, 316 N.W.2d 710, 711 (Mich. 1982)); *Toussaint v Blue Cross Blue Shield of Mich.*, 292 N.W.2d 880, 890 (Mich. 1980) ("Employers are most assuredly free to enter into employment contracts terminable at will."); *see also Haddle v. Garrison*, 525 U.S. 121, 127 (1998) ("[E]ven though a person's employment contract is at will, he has a valuable contract right which may not be unlawfully interfered with by a third person." (quoting *Ga. Power Co. v. Busbin*, 250 S.E.2d 442, 444 (Ga. 1978)); *see generally* Arthur L. Corbin, *Corbin on Contracts* § 70 (one vol. ed. 1952) ("[One] example of a unilateral contract in the form of an offered promise to pay for service to be rendered, is the case of an agreement to employ a person for an indefinite period at a stated salary . . . . [T]he transaction is a 'hiring at will.' The employee is privileged to stop work at any time; the employer is bound by his promise to pay for service rendered, but has the power of revocation as to service not yet rendered."); E. Allan Farnsworth, *Contracts* § 7.17 (4th ed. 2004) ("The judicial preference for termination at will was historically strongest where employment contracts were concerned. Under what is known as 'Wood's rule,' an employer is free to discharge an employee for any reason or for no reason at all." (citing Horace Wood, *Master and Servant* § 134 (1877)); Richard A. Lord, *Williston on Contracts* § 4:23 (4th ed. 1990).

"At will" simply refers to a particular term of the contract — specifically, its indefinite duration — "either party may terminate the employment contract at any time for any or no reason." *Morrison*, 663 F.3d at 256 (citing *Suchodolski*, 316 N.W.2d at 711); *see generally*

*Williston on Contracts* § 4:23 ("It is generally held in this country that a hiring indefinite as to time is terminable at the will of either party.").

Thus, the issue is not whether the parties had an employment contract. They did. The issue is whether that contract included the restrictive covenant contained in the "Commission Payment Policy" that Defendant asserts it implemented in February 2008.

As a general matter, "contract modifications are governed by the same rules as other contracts and require the same prerequisites: offer, acceptance, and consideration." *Metro Commc'ns Co. v. Ameritech Mobile Commc'cs, Inc.*, 984 F.2d 739, 744 (6th Cir. 1993) (applying Illinois law); *Farrell v. Auto. Club of Mich.*, 466 N.W.2d 298, 301 (Mich. Ct. App. 1990) (recognizing "that policy amendments could be construed as an 'offer to modify' contrary terms of a prior express agreement" and holding that "it is up to the factfinder to . . . determine whether the agreement was subsequently modified by virtue of an acceptance, on plaintiff's part, of defendant's policy-based 'offer to modify'").

Under Michigan law, "The party seeking to enforce a contract has the burden of showing that it exists." *Hergenreder v. Bickford Senior Living Group, LLC*, 656 F.3d 411, 417 (6th Cir. 2011) (citing *Kamalnath v. Mercy Mem'l Hosp. Corp.*, 487 N.W.2d 499, 504 (Mich. Ct. App. 1992)). "Before a contract can be completed, there must be an offer and acceptance." *Pakideh v. Franklin Commercial Mortg. Grp., Inc.*, 540 N.W.2d 777, 780 (Mich. Ct. App. 1995). "An offer is defined as the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Kloian v. Domino's Pizza*, 733 N.W.2d 766, 770 (Mich. Ct. App. 2006) (internal quotation marks omitted) (quoting *Eerdmans v. Maki*, 573 N.W.2d 329 (Mich. Ct. App. 1997)). Significantly, "A

-20-

manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent." *Restatement (Second) of Contracts* § 26 (1981), *quoted in Ayar v. Baymont Inns, Inc.*, No. 245775, 2004 WL 842502, at *3 (Mich. Ct. App. Apr. 20, 2004) (per curiam).

"An acceptance sufficient to create a contract arises where the individual to whom an offer is extended manifests an intent to be bound by the offer, and all legal consequences flowing from the offer, through voluntarily undertaking some unequivocal act sufficient for that purpose." *Kloian*, 733 N.W.2d at 771 (internal alterations omitted) (quoting *Blackburne & Brown Mortgage Co. v. Ziomek*, 692 N.W.2d 388 (Mich. Ct. App. 2004)).

"Whether the parties have mutually agreed to be bound 'is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind.'" *Bickford*, 656 F.3d at 417 (quoting *Kloian*, 733 N.W.2d at 771). "No contract can arise except on the express mutual assent of the parties." *Independence Twp. v. Reliance Bldg. Co.*, 437 N.W.2d 22, 24 (Mich. Ct. App. 1989) (citing *Woods v. Ayres*, 39 Mich. 345, 351 (1878)). Similarly, "The language of a contract should be given its ordinary and plain meaning." *Meagher v. Wayne State Univ.*, 565 N.W.2d 401, 415 (Mich. Ct. App. 1997) (citing *G & A Inc. v. Nahra*, 514 N.W.2d 255 (Mich. Ct. App. 1994)); *see also Holland v. Trinity Health Care Corp.*, 791 N.W.2d 724, 727 (Mich. Ct. App. 2010) ("We enforce contracts according to their terms, as a corollary of the parties' liberty of contracting. We examine written contractual language, and give the words their plain and ordinary meanings." (citing *Rory v. Continental Ins. Co.*, 703 N.W.2d 23, 30 (Mich. 2005)).

Here, genuine issues of fact exist as to whether either party objectively manifested express assent to be bound.[4]

First, and somewhat surprisingly, a question exists as to whether Defendant itself manifested its intent to be bound. In support of its allegations Defendant proffers two versions of its "Commission Payment Policy." Def.'s Mot. Ex. 9; Def.'s Reply Ex. 30. A single glance, however, shows that Defendant has not manifested its intent to be bound by either. Literally, Defendant has not "approved" them: the "approved by" line is blank on both. Defendant's own approval, its manifested intent to be bound, it is necessary for an offer.

Likewise, an issue of fact exists as to whether Plaintiff manifested his intent to be bound. As discussed above, Defendant's manager of compensation and benefits, Randy Twistol, testifies that the restrictive covenant "was distributed to all DSMs personally at the Snowmobile Sales Show in Nashville, Tennessee on or about February 22, 2008." Twistol Aff. ¶ 6. Mr. Twistol does not, however, expressly assert that Plaintiff was present at the Nashville snowmobile sales show. *See id.* ¶¶ 6–7. Moreover, unlike the signed acknowledgements that Defendant required for receipt of the employee handbooks, Defendant did not ask for signed acknowledgements for the receipt of the policy. Defendant thus has no direct evidence it gave Plaintiff notice of the policy.

And Plaintiff unambiguously testifies that he did not receive it, asserting: "The policy and procedure which is Exhibit 9 to Defendant's Motion, I only saw for the first time when I received it along with a letter dated January 13, 2009 from Randy Twistol explaining why the company

---

[4] Plaintiff does not dispute that, if the parties had demonstrated their assent to be bound, the policy would be supported by adequate consideration. *See generally* Ferdinand S. Tinio, *Sufficiency of Consideration for Employee's Covenant Not to Compete Entered into After Inception of Employment*, 51 A.L.R.3d 825 (1973) (collecting cases).

was not going to pay my post-termination commissions and bonuses." Pl.'s Aff. ¶ 11. Affirming his contention under questioning from Defendant's counsel during his deposition, Plaintiff reiterated: "I'm not aware of this policy and procedure at all. It was never presented to me in any way, shape or form that I recall." Pl.'s Dep. 123:1–3.

Seeking to rebut Plaintiff's assertions, attached to its reply brief Defendant produces an undated letter from Plaintiff to Mr. Twistol in which Plaintiff writes:

> Since my employment is going to end anyway, and I am going to offer my forced resignation, however I am not giving up my right to the agreed upon commissions that are owed and earned. I have enclosed a copy of those with this. I am asking you wave [sic] going to competitors as a complication of this.

Def.'s Reply Ex. 31. This letter suggests that Plaintiff may have been aware of the restrictive covenant prior to his forced resignation. (Plaintiff writes as if his employment has not yet ended, making it unlikely that the letter was drafted in January 2009, several months after he was forced to resign.) The letter does not, however, expressly reference the restrictive covenant. Rather, it asserts an entitlement that is inconsistent with the purported policy's terms — that Plaintiff has a "right to the agreed upon commissions," with "going to competitors" as a mere "complication." Thus, although the letter supports Defendant's contention that Plaintiff had notice of the policy, it does not unequivocally establish that Plaintiff had notice. When coupled with the issue regarding Defendant's own acceptance, issues of fact exist as to whether both parties objectively manifested their express assent to be bound. Drawing all reasonable inferences Plaintiff's favor (as the Court must on Defendant's summary judgment motion), Defendant is not entitled to summary judgment on Plaintiff's breach of contract claim.

## 2

Additionally, Plaintiff also raises a genuine issue of fact as to whether the company he

went to work for, Klim, is one of Defendant's competitors.

"Competitor" is not a defined term in the policy. Thus, the Court must give the word its ordinary meaning. *See, e.g.*, *Holland v. Trinity Health Care Corp.*, 791 N.W.2d 724, 727 (Mich. Ct. App. 2010) (quoted above). As a general matter, defining who is a "competitor" depends on defining the relevant market. *Cf.* William M. Landes & Richard A. Posner, *Market Power in Antitrust Cases*, 94 Harv. L. Rev. 937, 938 (1981) ("The standard method of proving market power in antitrust cases involves first defining a relevant market in which to compute the defendant's market share, next computing that share, and then deciding whether it is large enough to support an inference of the required degree of market power.").

And defining the market — defining the competitors — primarily presents a question of fact. *See E.I. du Pont de Nemours & Co. v. Kolon Indus. Inc.*, 637 F.3d 435, 442 (4th Cir. 2011) (noting that "market definition is a question of fact"); *Westman Comm'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216, 1220 (10th Cir. 1986) ("We recognize that market definition is a question of fact."); *Superior Consultant Co. v. Bailey*, No. 00–CV–73439, 2000 WL 1279161, at *11 (E.D. Mich. Aug. 22, 2000) ("A palpable question of fact remains whether and to what degree, if any, plaintiff Superior and defendant STC are 'competitors.'"); *United States. v. Rochester Gas & Elec. Corp.*, 4 F. Supp. 2d 172, 177 (W.D.N.Y.1998) (denying summary judgment as "there is a question of fact as to whether or not the University was a potential competitor of RG&E").

Here, this fact is disputed. Defendant, in support of its contention that Klim is a competitor, attaches an affidavit from its general manager, Ms. Walker, who testifies: "Arctic Cat considers Klim to be a competitor for the sale of snowmobile garments." Walker Aff. ¶ 6. Aside from this conclusory statement, however, Defendant offers no other evidence to establish

that the two businesses are competitors.

Plaintiff responds with his own affidavit, in which he contests Defendant's characterization, explaining: "I do not believe that Klim is a direct competitor of Arctic Cat for the reason that Arctic Cat's clothing and accessory lines do not directly compete. Klim's products contain Gortex and none of Arctic Cat's do. At no time did I offer or was I involved in the sale of any Klim products to Arctic Cat dealers that I had represented." Pl.'s Aff. ¶ 12. To support his assertion, Plaintiff also offers the deposition of Mr. Killian, who was asked, for example:

> Q: What is Klim?
> A: Klim is a manufacturer of high performance motor sports sportswear for both warm and cold weather riding.
> Q: Does Arctic Cat provide the same kind of sportswear?
> A: Arctic Cat provides riding gear; however, the nature of Klim's is much more technical. Klim has an exclusive Gortex agreement, Gortex being predominant in semi-permanent membranes, weatherproof membranes. Klim is a very expensive product. It's a different product.
> Q: Did Arctic Cat provide or manufacture or sell a similar product?
> A: No. Not one that had Gortex material in it.
> Q: Was it your belief at the time that you went to work for Klim that you were not going to work for a competitor?
> A: Absolutely.

Killian Dep. 31:20–32:9. Thus, in contrast to Defendant's conclusory statement that it considers Klim a competitor, Plaintiff presents a factual basis for his assertion that Klim is not. Although it is possible that Klim and Arctic Cat are in fact competitors, at present this a genuine dispute on the issue exists.

Defendant is not entitled to summary judgment on Plaintiff's breach of contract claim.

## IV

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment [ECF No. 8] is granted in part and denied in part.

It is further **ORDERED** that the motion for summary judgment is granted regarding Plaintiff's ELCRA claim, which is dismissed, and denied regarding Plaintiff's breach of contract claim, which is not dismissed.

It is further **ORDERED** that the hearing on Defendant's motion scheduled for Wednesday, February 15, 2012, at 2:00 p.m. is cancelled because the parties' papers provide the necessary factual and legal information to decide the motion.  *See* E.D. Mich. L.R. 7.1(f)(2).

<div style="text-align:center">

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

</div>

Dated: February 6, 2012

<div style="border:1px solid black; text-align:center">

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 6, 2012.

s/Tracy A. Jacobs
TRACY A. JACOBS

</div>